IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 13, 2010

**STEVEN MURPHY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**Nos. 01-02750, 01-02751      Carolyn Wade Blackett, Judge**

**No. W2009-00992-CCA-R3-PC  - Filed April 21, 2010**

The petitioner, Steven Murphy, was convicted of first degree premeditated murder and first
degree felony murder, which the trial court merged, and two counts of theft of property
valued at more than $1000, which the court also merged.  He was sentenced to an effective
life sentence.  This court affirmed his convictions and sentences, and the supreme court
denied his application for permission to appeal.  State v. Steven Murphy, No. W2004-02899-
CCA-R3-CD, 2006 WL 432388 (Tenn. Crim. App. Feb. 22, 2006), perm. to appeal denied
(Tenn. Sept. 5, 2006).  He filed a timely petition for post-conviction relief, asserting that trial
counsel was ineffective.  Following an evidentiary hearing, the post-conviction court denied
the petition; and, upon review, we affirm that denial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS
and NORMA MCGEE OGLE, JJ., joined.

John H. Parker, II, Memphis, Tennessee, for the appellant, Steven Murphy.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney
General; William L. Gibbons, District Attorney General; and Brooks Yelverton, Assistant
District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In the direct appeal, this court set out the facts upon which the petitioner's convictions
were based:

This case arises out of the stabbing death of the victim, Rhonda Pope, in her Memphis apartment. On Friday, April 7, 2000, the victim's brother discovered the victim lying dead on her bedroom floor. Although the bedroom had been ransacked and several items were missing, the doors to the apartment were locked and there were no signs of forced entry. The [petitioner], who had been renting a room from the victim, was not at the apartment when the police began their investigation. However, at approximately 11:30 a.m. the next day, he voluntarily came to the police department, where he eventually provided three separate oral accounts of the incident, was arrested, and gave an initial written statement suggesting that a drug dealer to whom he owed money was the perpetrator of the crimes.

As the investigation continued over the weekend, police officers learned that the [petitioner] had been seen carrying a television set from the victim's apartment to the victim's car in the early morning hours of Thursday, April 6; that later that morning he had tried to sell the victim's car without a title; and that he had pawned several of the victim's missing items. They also learned that the [petitioner] had failed to show up for his shift as a restaurant cook on Thursday night and had subsequently telephoned his employer to inform him that something had come up and he would no longer be able to work at the restaurant. The [petitioner] was formally charged with the victim's murder at 2:39 p.m. on April 10. Approximately four hours later, he gave a second statement in which he admitted that he had killed the victim.

Prior to trial, the [petitioner] filed a motion to suppress his statements to police on the basis that they were the product of an unlawful detention without a prompt probable cause hearing and he lacked the mental capacity to make a knowing and valid waiver of his right to remain silent or to have counsel present during questioning. At an April 13, 2003, hearing on the [petitioner's] motion to suppress, Sergeant James L. Fitzpatrick of the Memphis Police Department testified as follows. He had been a police officer for twenty-nine years, was assigned to the homicide bureau, and participated in the investigation of the victim's murder. From his initial investigation on April 7, he learned that the victim's bedroom had been ransacked; that two televisions, a computer, and computer equipment were missing from the apartment; that the victim's vehicle was not parked in its customary space but was found later that afternoon at a different, nearby apartment complex; and that the last time the victim had been seen alive was Wednesday evening when she picked the [petitioner] up from his workplace.

-2-

Sergeant Fitzpatrick's first contact with the [petitioner] occurred at approximately 11:30 a.m. on Saturday, April 8, when the [petitioner] voluntarily came into the homicide office with his girlfriend, Christina McKnight. Sergeant Earnestine Davison, the case coordinator, asked that he and Sergeant Ryall interview the [petitioner] while she and another investigator interviewed Ms. McKnight. Therefore, he and Sergeant Ryall went into one of the interview rooms with the [petitioner], where Sergeant Ryall began by reading the [petitioner] his rights. Although the [petitioner] told them he understood his rights, he refused to sign the waiver until his girlfriend read the rights to him as well. Since he had already informed the officers that he could not read very well, they agreed to his request and brought Ms. McKnight into the interview room. After Ms. McKnight had read the [petitioner] his rights, she and Sergeant Ryall signed as witnesses and the [petitioner] signed the waiver at 12:11 p.m. on April 8, 2000.

The [petitioner] was not in custody when the interview began but was placed under arrest at 2:00 or 2:30 p.m. as inconsistencies in his story began to develop. The [petitioner] first told the officers that the victim had picked him up on Wednesday evening at his place of employment, that he and the victim had separated to run errands, and that he had discovered the victim's body when he returned to the apartment a short time later. While being escorted to the bathroom, however, the [petitioner] made a "spontaneous utterance" that a "dope boy" named "Clyde," to whom the [petitioner] had owed money and who had been in front of the victim's apartment when the [petitioner] left by the back door, was responsible for the victim's murder. As the interview continued, the [petitioner] eventually provided three separate oral accounts of the incident.

Sergeant Fitzpatrick testified that he and Sergeant Davison, who had replaced Sergeant Ryall in the interview room, began taking the [petitioner's] first written statement at 3:45 p.m. Before they began, they informed the [petitioner] that he was under arrest and could be charged with the victim's murder. They also read him his rights, contained in the computer-generated form at the beginning of the statement, and the [petitioner] initialed the form, indicating that he understood those rights and wished to make a statement at that time. The [petitioner's] statement was typed by a secretary and read aloud to the [petitioner], who signed it at 7:45 p.m. The [petitioner] was responsive to their questions and did not appear to be under the influence of any intoxicant or to be suffering from any mental or emotional disability.

Sergeant Fitzpatrick further testified as follows. The next day, Sunday, April 9, the [petitioner] was taken from jail to an apartment complex near the victim's apartment so that he could point out where the alleged drug dealer, "Clyde," lived. While that was taking place, Sergeant Fitzpatrick and Sergeant Davison arranged for Kristy Boddie, the victim's neighbor, to come to the jail to see if she could identify the [petitioner] as the man she had seen carrying a television set to the victim's car in the early morning hours of Thursday, April 6. They subsequently conducted a lineup and Boddie identified the [petitioner]. Later that afternoon, the man the [petitioner] had identified as the drug dealer "Clyde," but whose real name was Carlos Shaw, came into the homicide office and described how the [petitioner] had tried to sell him the victim's vehicle without a title. Sergeant Fitzpatrick said that Shaw immediately and positively identified the [petitioner] from a photographic spreadsheet as the man who had tried to sell him the vehicle.

Sergeant Fitzpatrick acknowledged they had enough evidence to charge the [petitioner] with the victim's murder on Sunday afternoon, April 9. He explained, however, that the police department had an agreement with the district attorney's office that they would not charge anyone with first or second degree murder until they had discussed the case with an attorney from that office. Accordingly, he and Sergeant Davison discussed the case with the assistant district attorney general between 8:30 and 9:00 a.m. Monday morning, and the assistant district attorney general signed the form authorizing them to charge the [petitioner]. He said the [petitioner] was formally charged with the first degree murder of the victim at approximately 2:40 p.m.

Sergeant Fitzpatrick testified that the [petitioner] had, in the meantime, been brought back to their offices shortly before noon on Monday and that he and Detective Johnson had been interviewing him since approximately 1:00 p.m. He said that later that afternoon the [petitioner] revealed to Sergeant Davison, who had replaced Detective Johnson in the interview room, that he had concealed the murder weapon in a sock and thrown it behind the washer or dryer in the victim's apartment. Sergeant Fitzpatrick stated that they took a break in the interview process while Sergeant Davison dispatched investigators to the victim's apartment to retrieve the knife. He testified they began taking the [petitioner's] second written statement at 6:25 p.m. Before they began, they informed the [petitioner] that he was under arrest and had been charged with the first degree murder of the victim in the perpetration of a theft. They also informed him of his rights, and the [petitioner] once again indicated he understood his rights and wished to make a statement. The

-4-

[petitioner] was again responsive to their questions and did not appear to be under the influence of drugs or alcohol or suffering from any mental or emotional problems. When the statement was completed, Sergeant Thompson read it aloud to the [petitioner] and the [petitioner] and Sergeant Thompson both signed it. On cross-examination, Sergeant Fitzpatrick acknowledged that he knew at the time the [petitioner] first came into the homicide office that he had been involved in a homicide in Illinois approximately ten years earlier. He insisted, however, that the [petitioner] was not under arrest when the interview began.

Sergeant Earnestine Davison testified she had been employed by the Memphis Police Department for twenty-one years and had been working in homicide for five years. She confirmed that the [petitioner] voluntarily came into the homicide office with his girlfriend on April 8 and was not under arrest when the interview process began. She said she became involved in the [petitioner's] interview later that afternoon and participated in both of the written statements. She testified that the [petitioner] was advised of his rights prior to each statement and that each statement was read aloud to the [petitioner] before he signed it. In each case, the [petitioner] indicated that he understood his rights and wished to make a statement. He did not appear to be under the influence of drugs or alcohol or to be suffering from any mental or emotional problems.

Sergeant Davison also confirmed that the police department's normal protocol, per agreement with the district attorney's office, was for the district attorney's office to review and approve of any first or second degree murder charges brought against a suspect. She testified that the district attorney's office authorized the charges against the [petitioner] at approximately 9:00 a.m. on Monday, April 10, 2000, and that the affidavit of complaint and arrest warrant were then taken before a magistrate and executed at 2:39 p.m. On cross-examination, Sergeant Davison acknowledged that she had been informed by individuals who knew the [petitioner] that he was a drug addict but that she did not ask him whether he was under the influence of any drugs or alcohol at the time of the interviews. She further acknowledged that the arrest ticket used to book the [petitioner] into jail on Saturday evening stated only that there was "probable cause for arrest," which meant the [petitioner] had been held Saturday night, all day Sunday, and Monday morning and early afternoon without being formally charged.

At the conclusion of the April 13, 2003, hearing, the trial court denied

the [petitioner's] motion to suppress the statements on the basis of the alleged Fourth Amendment violation, finding, among other things, that there was no evidence that the police officers purposefully detained the [petitioner] in order to extract his confession. Thereafter, the hearing on the [petitioner's] motion continued on July 23, 2004, with the presentation of evidence relating to his claim of mental incapacity. The [petitioner] presented three expert witnesses in support of that claim: a clinical psychologist, a neuropsychologist, and a psychiatrist. Dr. Joseph Charles Angelillo, the clinical psychologist, testified that he was appointed to examine the [petitioner] in the spring of 2002. He said, during their first meeting, the [petitioner] reported that he had been hospitalized a number of years ago for a "significant head injury," that he had suffered from a depressed mood and been treated for psychosis, and that he had abused street drugs and alcohol. During that visit, he also learned that the [petitioner] was currently taking Prolixin, an antipsychotic medication, and Cogentin, a drug used to treat the side effects of Prolixin.

Dr. Angelillo testified that during his second visit, he administered the Wechsler Abbreviated Scale of Intelligence, or "WASI," test to the [petitioner], which was not valid for "purposes in the courtroom" but was valid for his purpose of determining whether he needed to follow up by administering a longer, more reliable test. On the abbreviated test, the [petitioner's] verbal IQ was 62 and his performance IQ was 74, for a full scale IQ of 66. One week later, he administered the "Wechsler Memory Scale" test, which measures "one's ability to process information." According to Dr. Angelillo, the [petitioner] performed better on the memory scale than he did on the abbreviated IQ test, with scores of 80 and 78, respectively, on the "immediate auditory memory" and "visual immediate memory" portions of the test.

Dr. Angelillo testified he saw the [petitioner] for a final time approximately one year later, in April 2003, when he administered the "Wechsler Adult Intelligence Scale . . . Third Edition," or "WAIS III," the "test . . . accepted by most psychologists as at least one of the gold standards." On that test, the [petitioner's] verbal IQ was 71, his performance IQ was 70, and his full-scale IQ was 68. When questioned by the trial court about how the full-scale IQ score could be lower than either the verbal or the performance IQ scores, Dr. Angelillo explained that it was because the WAIS III was "normed differently" than the "WAIS R," in which the full-scale IQ is the mathematical average of the verbal and performance IQ scores. Dr. Angelillo stated that he did not "evaluate [the petitioner] as far as retardation" but that "[a] score of

below 70 would qualify or describe one as mildly retarded if there were other . . . measures of adaptive functioning which also point in that direction." Based on his examination, Dr. Angelillo believed that while the [petitioner] might be able to understand the Miranda warning if it was broken up into sections, he would have difficulty in understanding it read as a whole. On cross-examination, Dr. Angelillo testified he was aware that the [petitioner] had a substantial prior criminal record but could not say whether the [petitioner] had any previous experience with the Miranda warnings.

Dr. Dale Foster, the neuropsychologist, testified that he accepted an appointment to examine the [petitioner] in February 2004 and eventually met with him on February 25, April 13, and April 28, 2004. During those visits, he administered a battery of psychological tests, including the Wechsler Adult Intelligence Scale, an IQ test; the "Categories" test, a "test of abstract reasoning, concept formation, and judgment"; the Minnesota Multiphasic Personality Inventory II, or "MMPI," which was "a personality inventory that looks for unconventional thinking" and "the tendency to . . . malinger"; and the "Validity Indicator Profile." He said that the [petitioner's] IQ scores fell in the "low average" range, with a verbal score of 81, a performance score of 83, and a full-scale IQ of 81. However, the [petitioner] missed over sixty percent of the items on the "Categories" test, which placed him in the range of performance that one would expect from a child of ten or twelve.

Dr. Foster testified that the [petitioner] "responded in a very extreme way" on the MMPI, suggesting the possibility that he was "faking bad" or malingering. He, therefore, administered "The Validity Indicator Profile," a nonverbal validity indicator, the results of which suggested that the [petitioner] was not malingering but instead was "making [a] good effort." Dr. Foster stated that he concluded the [petitioner] had an overall generalized impairment with severe impairment in the areas of abstract reasoning, concept formation, attention, and concentration. He testified that based on the "Halstead-Reitan Battery," which compared the [petitioner's] test results with those of people with and without organic brain damage, the [petitioner] fit best in the group of individuals who had organic brain damage with moderate impairment. Dr. Foster testified that the [petitioner] informed him that he was taking Prolixin, Depakote, and Trazodone. He explained that those drugs were an antipsychotic, an anticonvulsant, and an antidepressant and that they "would help with the problems related to the brain--mental problems." On cross-examination, he acknowledged that the [petitioner's] "F-Scale" on the MMPI was 120 and that an "F greater than 89 is usually interpreted to indicate

an invalid profile."

Dr. Joel Allen Reeceman, the psychiatrist, testified that he reviewed Dr. Foster's and Dr. Angelillo's reports, conducted his own evaluation of the [petitioner], and concurred in Dr. Foster's conclusion that the [petitioner] had organic brain dysfunction. He said that the [petitioner] "had a long-term diagnosis of organic mental disorder and previously had been found incompetent to stand trial for that reason." He stated that when he saw him in December 2002 and January 2003, the [petitioner] was taking Prolixin, an antipsychotic medication, Senequan, an antidepressant, and Depakote, an antiseizure medication. Dr. Reeceman testified that the [petitioner] was very simple and concrete in his thinking, and he opined that for that reason the [petitioner] would be unable to understand the rights contained in the Miranda warning. On cross-examination, he acknowledged that before evaluating the [petitioner], he had him sign a written waiver on December 30, 2002, acknowledging that his evaluation did not create a doctor-patient relationship between them. He further acknowledged that on January 15, 2003, he had found that the [petitioner] was competent to stand trial.

The State presented one witness on the issue of the [petitioner's] mental competency: Donald Newsom, the [petitioner's] former employer. Newsom testified that at the time of the victim's murder the [petitioner] worked as a short-order cook at his catfish restaurant. As part of his duties, the [petitioner] received, read, and filled from 50 to 100 orders during a typical day. Newsom testified that the [petitioner] was able to work independently and expeditiously and performed as well as the other cook employed at the restaurant. He said that, in addition to working for him, the [petitioner] was also a member of his church and had once been a houseguest in his home for a week. He testified that the [petitioner] received a letter from the Social Security Administration about his disability benefits during the period he stayed in his home and that he appeared able to read the letter and understand its contents. Newsom further testified that the [petitioner] asked that his wages be paid in cash so that his job would not interfere with his disability benefits.

At the conclusion of the July 23, 2004, hearing, the trial court overruled the [petitioner's] motion to suppress his statements on the basis of the alleged Fifth Amendment violation as well, finding that the evidence did not support the [petitioner's] contention that he lacked the mental capacity to understand the Miranda warnings. The [petitioner] was subsequently tried before a criminal court jury, found guilty of first degree murder and theft over $1000,

and sentenced to life imprisonment without the possibility of parole.

Id. at *1-6.

Subsequently, the petitioner filed a *pro se* petition for post-conviction relief, alleging that trial counsel was ineffective in a number of areas. Post-conviction counsel was appointed, and four amended petitions were filed.

At the evidentiary hearing, the petitioner testified that, in 1980, he had been hit in the head with a carjack, which had made him "slow in thinking, slow in movement, stuff like that there. I can't read or write." He said that he had been receiving disability benefits for seven or eight years and was able to sign his name. The petitioner explained his complaints against trial counsel: "That really he only cross-examined two peoples. He only asked . . . like two questions for each person. And as far as I was concerned, you know, him and [co-counsel], they didn't give me the proper representation that I needed as far as the trial."

He said that counsel asked one of the witnesses, Carlos Shaw, only if he had been "convicted in this courtroom about three months ago," and explained why he believed that this was inadequate:

I believe he should have been a little bit more thorough with the questions and everything and asked him a little bit more questions toward – see, because the questions that he asked, they really didn't make no sense, did he get convicted in this courtroom. He should have asked him how did he know me and stuff like that there or where did he know me from.

The petitioner then told of the second witness whose cross-examination was inadequate:

The lady she supposed to have been a knife specialist, forensic specialist or something like that. And the question that he asked, he asked her by her being a specialist the knives that they had – they had two kni[ves] – one of them they found in the apartment and it had blood on it. He come back and told me it wasn't my blood, wasn't the victim['s] blood. That raise a question from a third party being in the house. When I start asking him did he go out there to where all this took place at, he didn't go out there[,] look at the crime scene or nothing, anything like this here.

The petitioner said that he did not know whose blood was on the knife and did not believe that this witness found the knife, but he felt she should have been asked additional

questions: "Where did they find the knife at or [were] any fingerprints on the knife or raise the question about if it wasn't my blood or the victim['s] blood, who[se] blood was on the knife. No, they didn't none [sic] of this here."

He said that the victim's "best friend overheard James Polk stating that he was going to kill her," but the trial court disallowed this testimony because it was hearsay. The petitioner explained what additional steps he believed trial counsel should have taken regarding this testimony:

> Well, he should have . . . really went out there and talked to these peoples. It was about four peoples that said the same thing. He should have got[ten] with these peoples and talked to them and made a note on each and every one of them conversation, . . . what they said on the witness stand to him where he could have brought it up a little bit better than what he did.

The petitioner said that he felt trial counsel had been distracted because counsel's mother "was on the way to be deceased," and counsel had his cellular telephone on in the courtroom. He said that counsel should have visited the crime scene but did not although his investigator did so. He said that he asked counsel to interview, apparently as potential witnesses, a security guard whose name he did not remember, and his fiancée, Christina McKnight.

He said that, at trial, Carlos Shaw testified that the petitioner tried to sell him the victim's car; and, if trial counsel had investigated this witness, he would have found that he was a "liar" and was "not up to par when . . . handling business." The petitioner said that counsel should have interviewed crime scene personnel who dusted the victim's car for fingerprints, although he did not know their names or to what they would have testified, and should have been more thorough in cross-examining the crime scene officer who did testify. If called as a witness, his fiancée, Christina McKnight, would have said that she had just cashed "a five hundred and something dollar check" for the petitioner, so he did not need money. He said that a Walgreens security guard, who had seen him the night that the victim was killed, and Christina McKnight both came to court, but neither testified, counsel telling the petitioner that "they might hurt [him] more than they might help [him]." He said that, during the trial, counsel did not talk to him "more than about two times." The petitioner explained that counsel was not familiar with the defense's case, saying: "As far as not doing – taking care of asking questions, participating in things that was going on with – as far as with my case, . . ., like going to the crime scene and stuff, talking to witnesses and stuff like that there, that's about it."

He said counsel told him that, if he testified, the State could bring up that he had previously been convicted of voluntary manslaughter and armed robbery.

On cross-examination, the petitioner said that the Walgreens security guard could have testified that the petitioner was too drunk to commit the crimes with which he had been charged. He said that he had lived with Christina McKnight until he kicked out a window and she got a restraining order against him, which still was in effect at the time of trial. He said that, while in Chicago, he had "been to the penitentiary about eight times" but believed he "probably would've had a better chance" if he had testified at this trial.

The attorney who represented the petitioner both at trial and on appeal testified as to the first actions he took in the matter:

> [A]fter I got the private investigator, of course, we got all the discovery, and basically, I get together with my private investigator, you know, once I get the discovery, of course, once I get the discovery the first thing I do is talk to [the petitioner] and get a pretty good idea about . . . what his position is.

> So, after I did that and . . . had numerous conversations with [the petitioner] and with my investigator, . . . there came an issue, as the record reflects, . . . his real issue was as to, number one, as to whether or not he was competent to stand trial.

Counsel described his efforts as to the statement of the victim of the threat to her by James Polk:

> Well, I filed a motion in limine. In fact, I had attached the statement that I had in discovery plus those witnesses were there that I think the record would reflect I tried to make a proffer of proof and I don't remember the name, but of course, [the trial judge] overruled it.

> We took it up to the Court of Appeals and then the Supreme Court, and . . . the Appellate Courts agreed with [the trial court].

Counsel said that he issued subpoenas for both McKnight and the security guard, and both appeared at the time for trial. However, he decided not to call McKnight as a witness:

> Well, in the first place, Miss McKnight, I talked to her, I had numerous conversations with her and Miss McKnight basically said, you know, and it stuck out in my mind, sometimes when he . . . is on drugs and sometimes he

-11-

gets violent, . . . and she had had a restraining order against him. And . . . it's not what she says on direct. It's what she says on cross examination. And not only what she says, her demeanor, you know. Of course when you talk to a witness you naturally ask her – the lawyer asks her that on direct and then you know cross examination, if he was the State's lawyer – of course, I don't tell her that, you get a feeling about her demeanor and everything else like that.

But that – I mean, like I said before, what she would say on cross examination as far as her testimony, I think that could have been devastating, because you know, that would have been . . . exactly the same facts here that maybe he needed some funds . . . to support his drug habit, and he . . . killed the victim.

Counsel also explained why he did not call the security guard as a witness:

Again, you know, as a matter of strategy, I've learned over the years, you're better off when you put no proof on than weak proof.

And I mean, it wasn't directly on point, you know. And on cross examination, . . . once he said he saw him do that – he saw [the petitioner] – I think he was going to say he was in an intoxicated state or whatever[.]

Counsel said that Drs. Dale Foster, Joseph Angelillo, and Joel Reeceman testified on behalf of the petitioner at the motion to suppress his statements. Donald Newsom, his former employer, testified for the State, saying of the petitioner that he did not "notice any difference between him and the other[] [employees]. He takes orders and fills them, reads them, no problem." At the conclusion of the hearing, the trial court determined that the petitioner's statements would not be suppressed and that he was competent to stand trial.

As for the petitioner's claim that counsel received telephone calls during the trial regarding his elderly mother, counsel said he did not remember receiving such a call during "any kind of trial." Counsel said that he raised the issue of the missing audiotape in the direct appeal, but this court found it to be without merit. He said that there was "absolutely no merit" that one of the prosecutors went through the door that led to the jury room and seconds later the jury returned with verdicts of guilty.

## ANALYSIS

### I. Ineffective Assistance of Counsel

On appeal, the petitioner sets out a number of areas in which he alleges that trial counsel was ineffective, asserting that counsel "did not properly investigate and prepare for the trial in this matter and[,] as a result, employed a seriously defective trial strategy," thus prejudicing the petitioner. We will examine his claims.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of

"deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally,

-14-

a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

## A. Trial Preparation

The petitioner alleges that trial counsel "did not properly investigate and prepare for the trial in this matter and as a result, employed a seriously defective trial strategy; therefore, he hampered [p]etitioner's defense in this matter." As examples of these claims, the petitioner argues that counsel "provided no direction" for his investigator, "ignored the circumstantial evidence" which would be presented by the State, and failed to investigate the lighting conditions at Kristy Boddie's apartment.

The petitioner argues on appeal that counsel's preparation for the cross-examination of Kristy Boddie was inadequate in that he did not personally visit the apartment complex where she lived to examine the adequacy of the lighting or instruct the investigator to do so. Thus, according to the petitioner, counsel did not "tr[y] to impeach her testimony at trial." The State responds that, as to the lighting conditions at Boddie's apartment, the petitioner presented no evidence at the evidentiary hearing or citations to the record in this regard. Thus, according to the State, the petitioner's claims that the lighting conditions were inadequate are "purely speculative." We agree. There is no basis to assume the petitioner was prejudiced because counsel did not investigate and then cross-examine Boddie about the lighting conditions, when there is no proof in the record as to what the conditions were.

## B. Preparation for Direct and Cross-Examination of Witnesses

The petitioner alleges that trial counsel was not prepared for the examinations of witnesses, Donald Newsom, Dr. Dale Foster, and Dr. Joel Reeceman. We will review his specific complaints regarding these witnesses.

First, as to these claims, we note that the post-conviction court found them to be without merit:

> The Petitioner next alleges that trial counsel failed to properly investigate his case to sufficiently prepare for the testimony of witnesses, including Carlos Shaw, Kristy Boddie, Donald Newsom, Dr. Dale Foster, Dr. Joseph Angelillo, and Dr. Joel [Reeceman] at trial. The Petitioner further alleges that trial counsel failed to properly investigate as to the Petitioner's mental condition generally and at the time of the crime. At the Petition for

-15-

Post-Conviction Relief proceedings, trial counsel testified that in order to prepare for examination of the witnesses, he hired a private investigator to investigate the facts of the case. Trial counsel also testified that he obtained copies of the Petitioner's medical records in order to prepare for his examination of the doctors who were put on the witness stand to testify as to the Petitioner's mental capacity. Trial counsel also testified that because of the nature of the Petitioner's case, he hired the three mental health experts who testified in order to assist the trial court in determining whether or not the Petitioner was competent to stand trial. The Petitioner has not shown that trial counsel's actions in preparing for witness testimony fell below an objective standard of reasonableness.

As to Donald Newsom's testimony, the petitioner alleges that counsel failed to question Newsom further about his testimony that the restaurant orders which the petitioner read, according to counsel's question, were written in "very cryptic English." This was important testimony, according to the petitioner, because his claim was that he could not read at all.

Newsom did not testify at the evidentiary hearing, and the petitioner does not point to any proof in the record which would show whether questioning him further regarding the petitioner's ability to read would have resulted in a response helpful to him. Thus, we conclude that the petitioner has not shown either that counsel was ineffective in this regard or that the petitioner was prejudiced thereby.

Additionally, as to Newsom, the petitioner argues that counsel was deficient in that he did not clarify through this witness who received the letters from the Social Security Administration to the petitioner. Thus, the petitioner argues "the jury was presented with the information that [the petitioner] could read because it was implied that the letter he received came to Newsom[] instead of Christina McKnight." However, there is no proof in the record as to whom received the checks and other materials sent by the Social Security Administration to the petitioner. Neither Newsom, as we have stated, nor McKnight testified at the hearing, and there is no proof that their responses to the questions posed by the petitioner on appeal would have been helpful to the defense. Accordingly, the petitioner has not shown either that counsel was ineffective in this regard or that the petitioner was prejudiced thereby.

On appeal, the petitioner argues that counsel "did such a poor job of presenting the Doctors, that it resulted in giving the [p]rosecution a free opportunity to contest any allegation that [the petitioner] was incompetent to any degree and make the exact same points as they did at the competency hearing without any effort to salvage the Doctors' testimony

by the defense." As to Dr. Foster, the petitioner asserts that he was "never addressed by the [d]efense about the 'faking bad score' even on redirect after the [p]rosecution raised the issue." Thus, in the petitioner's view, counsel "essentially conceded that [he] was 'faking bad' about any defects he might have had." Dr. Foster did not testify at the hearing and, thus, there is no proof in the record that additional questioning, as the petitioner suggests, would have been fruitful.

Dr. Reeceman was cross-examined at the suppression hearing, as the petitioner relates, "about the medical release he had the [petitioner] sign," and the trial court later described the release as "being 'more complex than Miranda.'" Since the defense did not then address this at trial, the defense "conceded that [the petitioner] could understand complex matters." At the evidentiary hearing, trial counsel explained his purpose for calling the three expert witnesses at trial:

> [W]e were trying to get out, you know, every time you've got a witness, . . ., certainly when they cross examine, they're going to bring out points for the State, . . ., as well as the defendant. You have to weigh that, but evidently, you know, our thought process was the benefit as far as getting . . . their testimony about his mental state . . . outweighed any type of possible cross examination points that the State could make. I'm sure I argued that to the jury.

Thus, counsel explained that he called these three witnesses at trial to have proof as to the petitioner's mental state and that, in counsel's view, this need outweighed the liability of having them subjected to cross-examination.

Additionally, as to trial counsel's handling of witnesses, the petitioner faults counsel's efforts to introduce hearsay testimony suggesting that the victim's ex-boyfriend, James Polk, killed her. He argues that, in his motion, counsel attached summaries of the statements of Larnitra Wallace and Leonardis Cunningham but not the statements themselves nor affidavits or other information, and this was an ineffective way of presenting this motion. He asserts that "[t]he actual statement of Leonardis Cunningham raised the possibility of the excited utterance exception." There is no basis for our concluding that the trial court's ruling would have been different had trial counsel attached the statements of the witnesses or relevant affidavits. Likewise, there is no basis for our concluding that this hearsay statement would have been admitted had trial counsel argued that it was an excited utterance. Trial counsel testified at the evidentiary hearing that he did not consider the statement to be an excited utterance; and since neither Wallace nor Cunningham testified at the evidentiary hearing, we would be speculating to conclude that this would have been a successful argument.

Additionally, the petitioner argues that counsel was ineffective in failing to cite the court to the ruling of our supreme court in State v. Brown, 29 S.W.3d 427 (Tenn. 2000), asserting that, had this holding been cited, "the jury would have likely heard about the threats from James Polk which were incredibly similar to the manner in which the victim was killed." However, it does not appear that trial counsel was asked at the evidentiary hearing whether he had considered arguing that this case was relevant to the hearsay testimony about the threats. We cannot assume that, simply because counsel did not cite this case, he was ineffective and the petitioner suffered prejudice thereby.

Accordingly, we conclude that the record supports the conclusion of the post-conviction court that the petitioner failed to show that counsel was ineffective.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE